**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 20 1998**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

In re:  ERWIN SEYMORE KAHN,
M.D.,

         Debtor.

--------------------------------------------

ERWIN SEYMORE KAHN, M.D.,

         Appellee,

  v.

JAMES SCHIGUR,

         Appellant,

  and

DAVID C. SEITTER,

         Trustee.

No. 96-3308

D. Kansas

(D.C. No. 95-CV-2166)

## ORDER AND JUDGMENT[*]

Before **ANDERSON**, **EBEL**, and **KELLY**, Circuit Judges.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

In this Chapter 7 bankruptcy appeal we must determine the effect on the claims of a creditor, James Schigur, of a release provision in a post-petition settlement agreement. The debtor, Erwin S. Kahn, M.D., argues that under the plain language of the release, Mr. Schigur gave up every claim of any kind against Dr. Kahn personally and against his estate in bankruptcy. Mr. Schigur, on the other hand, argues that the settlement agreement, including its release-of-claims provision, relates only to an adversary proceeding contesting Dr. Kahn's discharge and does not implicate either the debtor's estate, represented by the trustee, or Schigur's claim against the estate.

The bankruptcy court sided with Schigur. The district court sided with Kahn, and reversed. For the reasons stated below, we conclude that the bankruptcy court was correct.

## BACKGROUND

The basic facts are not in dispute, just their interpretation. In October 1991 Dr. Kahn filed for relief under Chapter 7 of the Bankruptcy Code, and David C. Seitter was appointed Chapter 7 Trustee.[1] On February 13, 1992, Mr. Schigur, Kahn's largest creditor, filed his proof of claim in the amount of $169,411.69 (as amended prior to the event in question) against the bankruptcy estate.

---

[1]The Trustee takes no position in this appeal.

Both Schigur and the Trustee, Seitter, apparently were dissatisfied with Kahn's view of what assets belonged in the estate to be liquidated for the benefit of creditors. So, in March 1992, Schigur and Seitter joined forces and filed an adversary proceeding against Kahn, challenging, pursuant to 11 U.S.C. § 727(a)(2)(A), his right to receive a general discharge of his liabilities. Among other things, the complaint in the adversary proceeding accused Kahn of improperly transferring certain non-exempt assets prior to filing bankruptcy and of engaging in a "sharp pattern of dealing." Appellant's App. at 1-3. For relief, the complaint sought "that the discharge of the debtor's debts be denied, for costs of suit incurred herein, and for such other and further relief as the court deems just and proper in the premises." Id. at 3.

The dispute was settled about ten months later, and the settlement was memorialized in a four-page, double-spaced, eight paragraph document entitled "Mutual Release and Settlement Agreement." Among other things, the "whereas" clauses of the Agreement make clear that it was entered into in the adversary proceeding, a fact confirmed by the subsequent "Motion to Approve Settlement Compromise" filed with bankruptcy court,[2] and by that court's later findings.[3] In

_____

[2]The motion seeks the bankruptcy court's approval of "the Mutual Release and Settlement Agreement in the above-captioned adversary proceeding." Appellant's App. at 18.

[3]The bankruptcy court's ruling expressly finds that the adversary proceeding was

(continued...)

numbered paragraph 1, Kahn agrees to pay into the bankruptcy estate: $2,000 to settle the merits of the adversary case; $2,000 for his interest in Hummel figurines and sums paid pre-petition to a Dr. Gura; $7,000, representing approximately one-half of a California tax refund; and $7,500, representing approximately one-half of Kahn's federal tax overpayment for calendar year 1991. Appellant's App. at 24. Paragraph 2 addresses potential adjustments to the tax figures. Id. In paragraph 3, Kahn agrees to deliver up his coin collection. Id. And paragraph 4 deals with Kahn's promises to clear away hurdles to the liquidation of his interest in some duplexes in Leavenworth, Kansas. Id. at 25.

Paragraph 5, which contains the release in question, states as follows:

> 5. Debtor and Plaintiffs, for themselves, their heirs, successors, assigns, agents, attorneys, officers and employees, hereby waive, compromise, release, cancel, satisfy and discharge one against the other any and all debts, liabilities, claims, demands, actions and causes of actions whatsoever that they respectively have or may have or may claim one against the other from the beginning of time to the date of this Agreement, whether known or unknown at the time of the execution of this Agreement, and whether arising under federal law or regulation, a state law or regulation, a county or city regulation ordinance or at law or equity, EXCEPTING any issues relating to the post-petition payments of malpractice premiums by Spring Anesthesia on Dr. Kahn's behalf.

Id.

---

[3](...continued)
settled pursuant to the settlement agreement. Appellant's App. at 38.

Paragraphs 6, 7, and 8 generally contain boilerplate incorporation language and recitals that the agreement is binding on officers, directors, employees, agents, heirs and so forth, and that the parties are acting voluntarily with counsel. Id. at 25-26.

More than a year later, in May 1994, Dr. Kahn sought discovery from Mr. Schigur in the original bankruptcy case, and Mr. Schigur objected based in part on the settlement agreement entered into in the adversary case. Dr. Kahn then responded that because of the agreement's global release language, Mr. Schigur's proof of claim against the bankruptcy estate was barred.[4] In November 1994, after briefing and oral argument by the parties, the bankruptcy court determined that the settlement agreement did not bar Mr. Schigur's claim against the bankruptcy estate and thus overruled Dr. Kahn's motion to bar or strike Mr. Schigur's amended proof of claim. In August 1996, the district court found that the agreement unambiguously waived Mr. Schigur's claim against the estate and reversed the bankruptcy court.

**DISCUSSION**

---

[4]The trustee does not raise this argument. Kahn asserts his entitlement to pursue the matter because "the Trustee refuses to assert [this] defense that would be available to the Debtor outside Bankruptcy and which is presently available to the Trustee in order to defeat a substantial claim against the Estate." Appellee's Resp. Br. at 18.

Both parties present their positions in the form of legal, not factual, issues. So, our review is de novo, although we defer to the underlying factual findings made by the bankruptcy court. Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.), 82 F.3d 956, 958 (10th Cir. 1996); Themy v. Yu (In re Themy), 6 F.3d 688, 689 (10th Cir. 1993).

Mr. Schigur contends that the district court failed to recognize the legal distinction in bankruptcy between the debtor and the debtor's estate, represented by the trustee; and, as a result, missed the point that the only release by Schigur in the adversary proceeding went to Dr. Kahn, not to Schigur's claim against Kahn's estate. See Appellant's Br. at 10-11. Dr. Kahn points to the specific language of the release in which all the parties release each other of all claims whatsoever and says that the only legal question we have to resolve is whether a creditor can release his claim against a bankrupt's estate by way of a post-petition agreement. See Appellee's Resp. Br. at 1-2. He relies on 11 U.S.C. § 502(b)(1) as authority for an affirmative answer to that issue and on Kansas law regarding the binding nature of the release. Id. at 6-8, 13-14.

Whether and to what extent we get to these legal propositions necessarily begins with a matter of contract interpretation, since everything must proceed from the settlement agreement itself. As we understand it, Dr. Kahn's view of this agreement is that Mr. Schigur agreed to give up his $169,000 claim against

the bankruptcy estate for zero money in return—that, in order to maximize some sort of payment toward his $169,000 claim by forcing Dr. Kahn to put more assets in the estate ($18,500 plus a coin collection), he agreed to have no claim at all.

At several places in his brief, Dr. Kahn refers to the "valuable consideration" Mr. Schigur received in return for his alleged agreement to get nothing, see, e.g., Appellee's Resp. Br. at 1, 3, 23, but never identifies what benefit Schigur himself received. Furthermore, it is clear from the ruling of the bankruptcy court that the judge saw no benefit to Mr. Schigur, and that Dr. Kahn's counsel did not propose that any existed other than Kahn's marginal enhancement of the estate in which Schigur supposedly agreed not to share. No consideration is identified as flowing between the co-plaintiffs, Schigur and Seitter, the Trustee of the debtor's estate.

This view of the settlement agreement—that Schigur gave up a $169,000 claim for nothing, when the sole purpose of the adversary claim was to receive something—is absurd. Even assuming for purposes of argument that the words of the release support Kahn's position as a matter of semantics, we agree with the reasoning of Judge Posner in In re Stoecker, 5 F.3d 1022 (7th Cir. 1993), that:

> It is always open to a party to a contract dispute to argue that while the contract may seem clear on its face, certain background facts show that its plain meaning is not its true meaning—that the parties couldn't have meant what they seem to have said, that they must have been using words in a special way. This is the doctrine of "extrinsic ambiguity" . . . .

Id. at 1029.

The case in which Judge Posner invoked the doctrine of extrinsic ambiguity has strong similarities to this one: a release in a post-petition settlement agreement, with one party invoking plain language to claim that the other gave up more than $600,000 in exchange for $11,000. Id. at 1025-26, 1029. The court, in Stoecker, went on to say:

> We grant that too liberal an application of the doctrine of extrinsic ambiguity would deprive contracting parties of the protection they sought by reducing their agreement to writing (the settlement agreement here had an integration clause). Bidlack v. Wheelabrator Corp., 993 F.2d 603, 607-08 (7th Cir. 1993) (en banc) (plurality opinion); FDIC v. W.R. Grace & Co., 877 F.2d [614, 621-22 (7th Cir. 1989)]. Grace points out that the Illinois courts have been reluctant to invoke the doctrine in cases involving releases, where the disputed provisions usually are technical legal terms—which judges ought to be able to understand without the aid of witnesses. This is a release case. But it is a special case. The critical term, "claim," is not so clearly inclusive of defenses and objections that it is inconceivable that it was meant to exclude them, and the acknowledged disparity between what the trustee got and what he gave up, if "claim" is read more broadly, appears to be so great as to make it doubtful that either party could have thought the word was being used in its broader sense.

Id. at 1030 (emphasis added).

While we have not found any Kansas case which directly addresses the doctrine of extrinsic ambiguity, several Kansas cases do address latent ambiguity, which is how we referenced Judge Posner's reasoning in Vitkus v. Beatrice Co.,

11 F.3d 1535, 1543 (10th Cir. 1993).[5]  While these Kansas cases are not directly on point, their language is broad enough to be applicable.  See, e.g., In re Frank & Lotus Huxtable Living Trust, 757 P.2d 1262, 1265 (Kan. 1988) ("When either a patent or latent ambiguity actually exists in a written instrument, parol evidence is admissible to ascertain the meaning of the words used.").   In addition, we are satisfied that there is support in Kansas cases which repeatedly reject results which "reduce the terms of the contract to an absurdity."  Arnold v. S.J.L. of Kan. Corp., 822 P.2d 64, 67 (Kan. 1991) (quoting Garvey Ctr., Inc. v. Food Specialties, Inc., 519 P.2d 646, 647 (Kan. 1994)).  And, the Kansas cases cited by Kahn do little more than parallel the Illinois cases referred to in Stoecker in emphasizing the general proposition that releases must be strictly construed.  See Appellee's Resp. Br. at 13-14.

As in Stoecker, this is a special case, whether looked at within the four corners of the agreement or more broadly.  Even within the four corners, this release does not escape ambiguity.  The agreement relates by its terms solely to the adversary proceeding it is settling.  That litigation was a two-, not a three- sided affair:  Schigur and Seitter against Kahn, seeking to enhance the debtor's estate in bankruptcy.  Schigur and Seitter, referred to jointly as plaintiffs, had a

---

[5]In Vitkus, we cited with approval W.R.Grace, a case written by Judge Posner and relied on by him in the Stoecker opinion, as discussing a doctrine similar to latent ambiguity.  Vitkus, 11 F.3d at 1543.

singular interest; they had no business with each other, and the suit had no business with claims or claimants against the estate. Read as part of the whole agreement, the release of all claims between and among the parties can easily be read to refer to all claims of Schigur and Seitter, on their side, pertinent to a search for more assets from Kahn.

Under Kansas law, an instrument is ambiguous "when the application of the pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper one." Seacat v. Mesa Petroleum Co., 561 F. Supp. 98, 105 (D. Kan. 1983) (applying Kansas law) (citing Gardner v. Spurlock, 339 P.2d 65 (Kan. 1959)). One pertinent rule of interpretation is that "[r]easonable rather than unreasonable interpretations are favored by the law." Id. Its application renders this agreement ambiguous for the reasons just stated.[6]

_____

[6]Generally, an ambiguous instrument will be construed strictly against the party who drafted it. See Colburn v. Parker & Parsley Dev. Co., 842 P.2d 321, 328 (Kan. Ct. App. 1992). However, because the agreement here was prepared jointly and equally by the parties, we will not liberally or strictly construe the agreement against any party. See id.

Because the parties specifically excluded from the settlement certain claims the estate might have regarding malpractice premiums paid for the debtor's benefit and did not exclude Mr. Schigur's proof of claim, the debtor encourages us to apply another rule of construction, the maxim "expressio unius est exclusio alterius" (the expression of one thing is the exclusion of another). However, although it is applicable in Kansas to ambiguous contracts, Metropolitan Life Ins. Co. v. Strnad, 876 P.2d 1362, 1366 (Kan.

(continued...)

When an agreement is ambiguous, we must ascertain the parties' intent, which "may be determined from all the language used in the contract, the circumstances existing when the agreement was made, the object sought to be obtained, and other circumstances, if any, which tend to clarify the intention of the parties." Parsons v. Biscayne Valley Investors Ltd., 935 P.2d 218, 224 (Kan. Ct. App. 1997); see also Taliaferro v. Taliaferro, 921 P.2d 803, 812 (Kan. 1996) (stating that subsequent actions of the parties to the instrument can be considered in order to resolve the ambiguity); First Nat'l Bank of Olathe v. Clark, 602 P.2d 1299, 1304 (Kan. 1979) (quoting Mosher v. Kansas Coop. Wheat Mkt. Ass'n, 15 P.2d 421, 423-24 (Kan. 1932) ("If the parties have by their conduct placed an interpretation on an ambiguous contract, it will be followed by the court . . . .").

On the facts presently in the record, there would seem to be no difficulty in ascertaining the intent of the parties here. Mr. Schigur provided the district court with an affidavit from the Trustee indicating that "[t]he intent of the parties to the Agreement was not to eradicate the claim of Mr. Schigur against the Estate." Appellant's App. at 52. Furthermore, after signing the agreement, Dr. Kahn

---

[6](...continued)
1994), this maxim "is merely an auxiliary rule of construction and is not conclusive." Id. "The extent to which the doctrine should be applied depends . . . on how clearly the drafter's intent is otherwise expressed." Id. Because we find the parties' intent is clearly indicated by the circumstances surrounding the agreement, application of this maxim is unnecessary.

proceeded with discovery in the original bankruptcy case as if Mr. Schigur's claim against the estate were still enforceable. In fact, he did not even raise the issue of the settlement agreement as a defense to the proof of claim until after Mr. Schigur had raised it in response to Dr. Kahn's discovery request. Appellant's Br. at 5. Thus, the record strongly suggests that when the agreement was executed, no party involved in the agreement believed that Mr. Schigur's claim against the estate would be barred and that the only reasonable construction of the agreement was that Mr. Schigur's claim against the bankruptcy estate was enforceable. See Weber v. Tillman, 913 P.2d 84, 97 (Kan. 1996) ("Construction of the contract is one that makes the contract fair, customary, and such as prudent persons would intend."). And, finally, after reviewing these circumstances, the bankruptcy court found that the parties did not intend that Schigur's claim against the estate was being extinguished. Appellant's App. at 40.

Normally, once a court has determined ambiguity as a matter of law, the question of intent is one of fact to be determined by the trial court, in this case the bankruptcy court. Stoecker, 5 F.3d at 1030. Thus a remand for fact finding is generally appropriate. Id. This is especially so in this case where both parties have disclaimed ambiguity and neither raised nor pursued arguments on the point

in the bankruptcy court, district court, or in this court; and we are deciding the case on an issue not raised or briefed by the parties.[7]

However, it is clear from the record that a remand would be a waste of judicial resources. The bankruptcy court arranged for a hearing precisely on the question of the effect of the release before us, and all parties made such presentations to the court as they thought helpful to their respective positions. As part of those presentations, both counsel for Schigur and the Trustee (by affidavit) made it clear that the intent of the release was limited to the context of the adversary proceeding, and had nothing to do with Schigur's claim against the debtors in bankruptcy. Counsel for Kahn did not suggest any factual scenario to the contrary, limiting his arguments to the "plain language" of the release. The bankruptcy court then made a specific finding that it was not the parties' intent that Schigur's claim against the debtor's estate was to be extinguished. Appellant's App. at 40. We are hard pressed to know what else would happen on a remand to the bankruptcy court. Accordingly, we elect not to remand for a further determination of the meaning of the settlement agreement, and hold that

---

[7]The court of appeals, as well as the district court, may affirm the bankruptcy court's decision on any alternate grounds supported by the record. Sampson v. Sampson (In re Sampson), 997 F.2d 717, 721 (10th Cir. 1993).

-13-

the bankruptcy court was correct in concluding that Mr. Schigur's claim against

Dr. Kahn's estate in bankruptcy was not released by the settlement agreement.[8]


## CONCLUSION

For the foregoing reasons, the decision of the district court is REVERSED

and the case is REMANDED to the bankruptcy court for further proceedings

consistent with this opinion.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge

---

[8]Because we conclude that the settlement agreement does not bar Mr. Schigur's claim, it is unnecessary to decide whether, under bankruptcy law, a creditor can release his claim against the bankruptcy estate by way of a post-petition settlement. Therefore, we do not address this issue. See Griffin v. Davies, 929 F.2d 550, 554 (10th Cir. 1991).