# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1028

In the Matter of:

A.G. FINANCIAL SERVICE CENTER, INC.,

*Debtor.*

Appeal of:

BARBARA HUGHES, *et al.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. NA 01-80-C-B/S—**Sarah Evans Barker**, *Judge.*

———————

ARGUED SEPTEMBER 9, 2004—DECIDED JANUARY 19, 2005

———————

Before EASTERBROOK, EVANS, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* A.G. Financial Service Center issued private-label credit cards, which consumers used to purchase products from single merchants. Between 1992 and 1995 its stable of merchants included distributors of satellite television systems. That line of business was a disaster. A.G. Financial experienced high delinquency rates. Worse, some borrowers complained that they had been misled about the terms of credit or the costs of satellite TV. About 500 borrowers sued. A suit in Mississippi ended in a judgment for $167 million, almost all of it punitive damages. A.G. Financial responded by filing a petition in bank-

ruptcy. Other than about $2 million in cash, A.G. Financial's principal asset was a claim against American General Finance, Inc. (AGFI), its corporate parent, on the theory that the parent had induced the subsidiary to mislead the borrowers or otherwise bore responsibility for their injuries.

To resolve this claim, AGFI agreed to pay off all of the subsidiary's debts other than punitive-damages awards. A global settlement ensued—well, an all-but-global settlement ensued. Almost all of A.G. Financial's actual and contingent creditors agreed to accept specified sums; to the holdouts, A.G. Financial (which meant, as a practical matter, AGFI) offered a choice between $5,500 cash (less any unpaid balance on the account) and an opportunity to prove actual damages to a trier of fact. Only eight of 238,721 cardholders contended that these options are inadequate. Three of these eight had not bothered to file claims in the bankruptcy, so only five objectors have preserved their positions. These five have not tried to establish that their actual damages exceed $5,500; it is hard to see how borrowers who used A.G. Financial's credit to get satellite dishes and service could make a plausible claim that $5,500 is too low. What they want is a shot at punitive damages. The confirmed plan of reorganization rejects all claims to punitive damages and enjoins A.G. Financial's creditors from suing AGFI. The five objectors say that these provisions are unwarranted, and they want us to direct the bankruptcy court to give them jury trials at which punitive damages will be an option.

Appellate jurisdiction is the leadoff subject. Appeals lie from final decisions, see 28 U.S.C. §158(d), §1291, and the district court's approval of the plan was not quite definitive. The judge noted that one provision could be understood to exceed the bankruptcy court's jurisdiction, which is limited to core matters and others related to the bankruptcy. To avoid any potential for conflict between the plan and the governing statutes, the district judge remanded with instructions to add to the plan a statement that "the bankruptcy

court retains only such jurisdiction as is legally permissible, notwithstanding Section 10.2 of the Plan, to enforce all provisions of the Plan". Instead of waiting for the bankruptcy judge to make this change, the five objectors appealed immediately. (Actually all eight dissatisfied cardholders appealed, but the three who failed to file claims are pursuing a will-o'-the-wisp. We disregard them from here on.) A.G. Financial and AGFI contend that the appeal is premature; and, because the bankruptcy judge eventually fixed the problem (writing the district judge's language into the plan), and the five objectors neglected to appeal from that order, a jurisdictional defect would conclude the litigation.

Finality is essential to appellate jurisdiction, and a remand almost always shows that the district court's decision is not final. *In re Lopez*, 116 F.3d 1191 (7th Cir. 1997). But *Lopez* and other decisions recognize an exception: an impending ministerial act does not make a decision non-final, for routine action on remand is unlikely to precipitate a later appeal. *Id.* at 1192. See also, e.g., *In re Stoecker*, 5 F.3d 1022 (7th Cir. 1993); *In re Riggsby*, 745 F.2d 1153 (7th Cir. 1984). To say that the remand is for a ministerial act is to say that the district judge *has* fully resolved the litigation: there is no legal decision for a bankruptcy judge to make, no fact to find, no discretion to exercise.

What today's dispute shows is that it may be hard to decide when action on remand is "ministerial." The plan as approved had a problem; a fix was simple, but the bankruptcy judge was not *required* to use the district judge's proviso. The bankruptcy judge could have redrafted §10.2, and such a revision would have required the exercise of legal judgment. As it happens, the bankruptcy court used the district judge's language verbatim, but things might have developed otherwise. And that, the appellees insist, means that the remand was not for a ministerial act.

Disputes of this character imply that a more formal and unyielding definition of a "final decision" has something to

recommend it, but none of the parties has asked us to re-visit circuit law on the point. So we must characterize the task that the district judge set for the bankruptcy judge: is it "ministerial" or not? One illustration of a "ministerial" task given by our decisions is the award of post-judgment interest required by statute. If that task is "ministerial," this one must be too. Parties could dispute both the rate of interest and the method used for compounding. Most calculations go smoothly, but some yield dispute. There was less room for dispute about the modification of this plan. There are a hundred ways to state that "this plan does not attempt to usurp jurisdiction," but all come to the same thing, and none is apt to produce a second round of appeals—certainly not on the same issues now presented, an important qualification. See *Stoecker*, 5 F.3d at 1026-27. This remand was so straightforward, and the solution so simple, that no one noticed the potential jurisdictional difficulty until shortly before oral argument, when the appellees filed a motion taking back their earlier view that the appeal was proper. This court is grateful when counsel attend to jurisdictional questions; counsel for the appellees receive our thanks; but they were right the first time. The district judge's decision was final, the appeal is proper, and we turn to the merits.

Appellants present 11 distinct issues, most of them beside the point. Because the plan promises to pay creditors 100¢ on the dollar for all claims other than punitive damages—and because $5,500 overcompensates the five appellants, who have not endeavored to quantify actual loss—the only issue of moment is whether the cardholders are entitled to pursue punitive damages. Both the bankruptcy judge and the district judge said that punitive damages are unavailable in bankruptcy, because their award would be unfair to other creditors, but neither judge attempted to locate this rule in the text of the Bankruptcy Code. Bankruptcy law enforces non-bankruptcy entitlements, unless they are modi-

fied according to the Code. See, e.g., *Butner v. United States*, 440 U.S. 48 (1979). Bankruptcy courts lack authority to alter rules of state law, or depart from those in the Code, to implement their own views of wise policy. See *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004).

Only one appellate decision that we have been able to find provides direct support for the view that punitive damages are unavailable in bankruptcy, and it tossed off the subject in a single thinly reasoned paragraph. *In re GAC Corp.*, 681 F.2d 1295 (11th Cir. 1982). (Our own decision in *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794, 797 (7th Cir. 1986), on which defendants rely, recognized what *GAC* and some district judges had concluded but did not consider whether that position is correct.) The eleventh circuit appeared to believe that because punitive damages are, well, punitive, there is no purpose in their award after bankruptcy; it also thought that bankruptcy judges are entitled to reject all punitive claims (including, say, trebled damages in antitrust and penalties for filing false tax returns) that would dilute the interest of other creditors. Since that decision's release the Supreme Court has rejected the contention that tax penalties may be disfavored categorically, see *United States v. Noland*, 517 U.S. 535 (1996), strongly implying that case-by-case administration of the Code's authority for equitable subordination is the right way to deal with all punitive financial claims. See Thomas Grant, *How United States v. Noland Prohibits the Disallowance of Punitive Damages in Chapter 11*, 14 Bank Dev. J. 199 (1997). Thus if state law deems punitive damages unavailable against an insolvent defendant, federal bankruptcy courts would follow suit on the *Butner* principle; but if state law allows punitive awards against insolvent parties, there is no federal bar—though whether a punitive award should be subordinated to other claims is open to independent consideration under the terms of the Bankruptcy Code. See 11 U.S.C. §510(c)(1); *United States v.*

*Reorganized CF&I Fabricators*, 518 U.S. 213 (1996) (discussing equitable subordination in bankruptcy).

The district judge did not ask whether punitive damages would be available under state law but made it plain that any punitive awards would rank behind other claims, which makes it hard to see what a remand could accomplish. Valuation of claims *against* a debtor in bankruptcy is something that a court may elect to resolve itself, even though claims by debtors against third parties sometimes require jury trials. See *Langenkamp v. Culp*, 498 U.S. 42 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Katchen v. Landy*, 382 U.S. 323, 336-40 (1966). Bankruptcy courts may relinquish tort claims to state tribunals, see 28 U.S.C. §1334(c), or a district judge may withdraw a reference and conduct a jury trial, see 28 U.S.C. §157(d), but with few exceptions (none applicable here) creditors of the estate do not have a right to either step—and neither the bankruptcy judge nor the district judge had the slightest inclination to empanel a jury to hear *this* claim as a matter of discretion, or to award punitive damages (a discretionary remedy altogether) in a bench trial. So what would be the point?

Moreover, no one is entitled to a trial of any kind unless there is a disputed issue of material fact. Appellants have not shown that there is such an issue; they have not bothered to tell us what they think A.G. Financial did wrong, or why its missteps (whatever they were) justify punitive damages. The statement of facts in appellants' brief is one page long and does nothing except limn a few of the steps taken in the bankruptcy; we are bereft of facts about A.G. Financial's conduct. And a claim under federal law would fare no better. The Truth in Lending Act authorizes penalties on top of actual damages, but these are modest—$1,000 or less per person, see *Koons Buick Pontiac GMC, Inc. v. Nigh*, No. 03-377 (U.S. Nov. 30, 2004)—and would not enable the cardholders to exceed the $5,500 already on offer without

need for proof of injury. One freakish jury verdict in Mississippi, never reviewed by an appellate court, does not show that material disputes require a trial in Indiana. (A.G. Financial contested the 500 or so suits filed against it and appears to have prevailed or settled the rest for small sums, though the single loss was a doozy.) Indeed, appellants not only fail to describe the facts on which they rely but also fail to name the body of state law that they think should govern. They have utterly neglected to lay the groundwork for punitive damages.

As for the injunction forbidding suit against AGFI: this was just a precaution against a never-say-die attitude. Cardholders did not deal with AGFI, whose acts harmed them indirectly, if at all, through their influence on A.G. Financial. If it had remained in business, A.G. Financial's creditors might have attempted derivative litigation on its behalf; but once the bankruptcy commenced, it became the collective proceeding through which such claims are vindicated for creditors' mutual benefit. See *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 462 (7th Cir. 1991); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1348-49 (7th Cir. 1987); *In re Kaiser*, 791 F.2d 73 (7th Cir. 1986). Creditors cannot bypass a bankruptcy by seizing a debtor's choses in action; they are assets of the estate. Cardholders lost nothing when the district judge blocked them from trying to appropriate a claim belonging to A.G. Financial—a claim that had, moreover, been settled and released with the court's approval. AGFI was not going to provide the creditors with full compensation if they could then file separate suits for more; peace is essential to settlement.

Our five borrowers rely on *Fogel v. Zell*, 221 F.3d 955, 962-63 (7th Cir. 2000), which holds that bankruptcy courts may not enjoin suits by tort victims who were never notified of the bankruptcy. *Fogel* offers them no aid: first because the claim they have been enjoined from pursuing belongs to

A.G. Financial, and second because they *were* notified of the bankruptcy and have enjoyed ample opportunity to be heard on their contentions. Having received their due, they may not start again in another court. *Fisher v. Apostolou*, 155 F.3d 876, 882-83 (7th Cir. 1998), and *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), similarly are unhelpful to the cardholders. They concluded that bankruptcy courts may not foreclose litigation against third parties that may be responsible jointly with the bankrupt entity (for example, joint tortfeasors, guarantors, and the like). But AGFI is not a joint tortfeasor; as we have explained, its responsibility (if any) is *to* the debtor, and the cardholders have only a derivative claim that has been settled and released. There is not and never was any claim against AGFI for them to pursue individually.

Only one of appellants' many other contentions requires discussion. The five cardholders say that the judge should have ordered A.G. Financial to turn over its customer list (which the parties oddly call "the matrix") so that their lawyer could solicit more clients. The customer list was an asset of the debtor, which sold it to Associates Commercial Bank for the benefit of all creditors. (The buyer is unrelated to AGFI; there is no skullduggery afoot.) Both the Code, 11 U.S.C. §107(b)(1), and Fed. R. Bankr. P. 9018 authorize the court to withhold confidential commercial information from public disclosure. Handing the list over for free would have diminished the value of the estate. Lawyers have a right under the first amendment to solicit clients; they do not have a right to a subsidy in this endeavor. Counsel could have bid for the list like any other asset, or they could have rented the list from its buyer. Lawyers pay for paper, books, office space, and other inputs into their profession; they must pay for mailing lists too.

AFFIRMED

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*